My name is Dennis Moran. I'm representing the Plaintiff Vulcan. It goes by the business name NetLogic. This is an appeal against the defendant, which goes by the name of T-Mobile, a cellular phone company. This is a breach of contract case. It's in the federal court based on diversity. I would say it's a standard run-of-the-mill breach of contract case, but they're all a little bit different. But this really is. There's a dispute over pricing, really, and as to how the contract was carried out. In this case, we were halfway through discovery. The district court stopped the discovery. We had a summary judgment motion pending on a partial summary judgment on some of the material issues. District court stopped the discovery, truncated the entire case, and dismissed our entire case in really what I've got to describe as a case of first impression in the sense that the district court made substantive findings of spoliation in an arena where there were very conflicting facts. It was hotly disputed by my client, NetLogic's, and its president, Mr. Acri, that it had done anything wrong, that it had spoliated any documents. The case was conjured up by a former employee who got mad at Mr. Acri after they separated. Then got un-mad. Well, I don't know if he ever got un-mad. He certainly changed his tune. And his story. And his story. Or one could say he changed his story when he went in and got secretly recorded by the T-Mobile attorneys. And then when he was put under oath in a very interesting definition of secret, he was told there was someone there taking notes, right? He was told that an assistant named Thad was in the room taking notes. And that's different than saying we're recording your conversation, that we have a court reporter here and he's doing a verbatim transcript. And the distinction is critical because these are clever lawyers and they wanted to get him to talk. So what do you do? You tell, if you want a guy to talk trash about his former boss, you call them, didn't he? He called them, didn't he? He called them and said he wanted to talk. And there's a dispute about what was said in the first call. Not about the Mariners or the Sounders or the Seahawks. He wanted to. Talk about some bad stuff your guys did. He wanted to talk trash about his former boss. He's not the first witness in a case who wanted to talk trash about his former boss. And he's not the first one of those types of disgruntled employees who, when he gets up on the stand, raises his hand in the sworn under oath forum, tells the truth. And says, you know what, I was talking smack about my boss, but this is serious. That wasn't true. Well, you know, I tend to agree with you that counsel's statement prior to that phone conversation was misleading. But he contacted them knowing that the conversation and the information he relates then would be used for purposes of the litigation. There was an ongoing lawsuit going on. So given those circumstances, the fact that someone was taking notes and he knew that the conversations or the information he provided would be used for purposes of litigation, he knew that this would culminate in a declaration that he would be asked to sign. How can you still characterize that as private conversations? Well, let me make it clear. I'm not here to defend that individual. He's not my client. He's a witness. Okay? What he, that was not Mr. Akery calling up. That was somebody else. How can I characterize it as a private conference? What is private is defined by our state of Washington, right? Because it's a diversity case and under Feldman, I think it's Feldman, the state of Washington definition of privacy applies. That is a big definition. And there's a distinction, let me make this, a critical distinction between the content of someone's recording itself. What Mr. Dillon was saying, and I think this is, he was telling, he was conveying content that was going to be public. He was saying he's talking smack about his boss. But he was doing it in a conversation he thought was private or more significantly under the Washington law, it falls to the other person, the person who's doing the recording really to show that this was very clearly not a private conversation. In order to determine the difference, we look at the different cases that talk about it. When is it private, when is it not? And we have a case, that Cunningham case, where you have a suspect in a murder investigation talking to a police investigator. That's a criminal case, isn't it? It is a criminal case, but the same Privacy Act statute applies. And the Washington court made it very clear there that that conversation between a murder suspect and a murder investigator working for the police was a private conversation under the definition of the statute. Now if that is private, it's hard to imagine something more real formal than that about something that's more meaningful than murder. If that is private, look, a guy calling in to the other side's lawyers and talking smack about his former boss is something less than that. That's private, right? Look, Dillon appeared under oath before the district court, didn't he? He did. And the district judge determined that he was not credible, correct? The district court judge... Can I have a... you start with a yes or no? Yes, basically. He did determine that, correct? That's what he said. And he also determined that what Dillon told the lawyers in that recorded conversation was entirely credible. He wrote that in his order, yes. These were factual findings. These are not... Well, he didn't say it was entirely credible because there were a lot of things... he didn't say everything was entirely credible, but he did say he found the prior statements credible. This is the problem. There's two problems with this. One is the district court is looking at rank hearsay and trying to turn it into evidence. And didn't he also make a finding that even without considering the transcripts, Dillon and Acri, is that how... Acri, yes. Their declarations admitted many of the actions constituting spoilation of evidence and were sufficient on their own to support dismissal. That was his finding, correct? That was his finding or conclusion, yes, that he wrote. In doing so... What do you mean that he wrote? I mean, that's his finding. Well, that's his finding. He wrote it, yeah, finding or conclusion. Yeah, that's what he said. That's what he found. Well, how do you deal with that? I mean, let's assume we accept everything you say. Why isn't that enough? Well, because very clearly in making those findings and conclusions, the district court judge stepped out of his role as a judge and became a juror. Well, that's what judges are supposed to do, making findings. Well, not when there's a jury trial. The ultimate findings of fact where they are disputed are for a jury to decide. Because if a judge steps in halfway into a case and just decides, well, I'm going to start making findings of fact... No, we're talking about spoiliation claims, which is slightly different as a sanction. I beg to differ with you, but we've seen, at least I've seen other cases in which this very scenario occurred. A judge holds hearings on spoliation and makes a determination on a sanction. That's different from a traditional summary judgment decision. It is sometimes. And let me draw the distinction between the IDX case, which is I think the most recent case, and the Wong case, which is actually the one that the district court judge cited. And I think he cited it and then went the opposite direction. In the Wong case, it was a spoliation case. Absolutely, it was a latter spoliation case. The allegation of the plaintiffs was the plaintiffs said that the defendants tampered with the latter. And it was a fall-off-the-ladder case. I mean, that's the guts of the case. Okay? The Ninth Circuit goes through and cites Washington case law on spoliation, cites California case law on spoliation, and says, look, you've got a disputed issue of fact about spoliation and the proper way to resolve it. Right. But there's a difference between the tort of spoliation and spoliation as used as a sanction. I mean, that's what I'm saying. I understand your argument completely when you're talking about a tort that goes to a jury and they're asking for damages. But when somebody goes in front of a judge and says, I'm seeking the sanction of dismissal, do you have a case that says they can't, the district court can't use that? I mean, the classic cases are if you're sanctioning somebody, you hold a hearing. Well, here's what's happening with the IDX case. Traditionally, the tort of spoliation is morphing into something like this sanction. Right? No. It is. Because, for example, the IDX case, there was a guy went and erased his computer after he was told not to. Said I had some stuff on it and wrote a program to write 2200 files. Okay. There was no dispute of fact about what he did. The issue was what do you do about it? Okay. There are no cases I could find that have been cited that said, well, you have a legitimate dispute of fact as to whether the guy did it. And I'm not talking about whether Dylan said something happened, but whether the party spoliated. And that's Mr. Acri here. Mr. Acri said, I didn't do any of this stuff and he offered adequate explanations for all of it. Now, the judge said, well, those aren't adequate. I'm going to suggest it was for the jury to determine whether those were adequate. The jury finds facts. The jury assesses credibility. Can you cite a case in which a jury has found facts that form the basis of a district court sanction? That's the distinction that I have trouble with in your argument is this, is that we're talking about sanctions, which are in the purview of the inherent powers of the court, versus a jury decision on deciding damages on a tort to apples and oranges, as far as I'm concerned. Well, they should be apples and oranges. Let me see if I can approach it this way. I mean, it would be improper in my view, and you can correct me. I'm just having a conversation with you. It would be improper in my view for the district court to say, let's determine, let the jury decide the sanction of dismissal. You're right. I agree. So how is the judge supposed to decide the sanction? He's got a motion from the defendants on a motion to dismiss. They have a hearing. He's got to make some findings of fact. The hearing was only on, was one purpose, narrow purpose. The court defined the hearing as simply this. It was very clear in the order. Only as to whether the statements made, the statements recorded, were actually said by Mr. Dillon. It wasn't a hearing about whether he did it or not. Okay. I may have some difficulty with that. I'm going to ask you to decide. But I gather you would agree that a district court's entitled to have a full hearing, hear all the evidence, and make some judgment on the coiliation claim as a sanction. I'm going to agree under certain circumstances that make sense. But I'm going to suggest these. Well, obviously not. Under other circumstances, it's not. And let me tell you why. Because if you give that unfettered ability to the district court, where the district court can, if just one witness comes in, one non-party witness comes in and says, look, I know this party did all sorts of bad things, and the district court can then just stop the entire process right now, call that guy in, the guy comes in, recants it under oath, and the district court can say, you know what, you're out the door. Write the jury trial, be damned. There are a lot of facts and allegations that Mr. Dillon disavowed at the hearing. But there were some pretty significant conduct that the court found to be spoliation of evidence that he didn't disavow. So he highlighted certain statements in the transcript, and he put a little note, oh, I was frustrated, and so on and so forth. But there were also other conducts that the district found corroborated by the declaration that he put in the record and also by Mr. Acri as well. So, for example, the statements about keeping two sets of books and merging them. Mr. Acri admitted that he gave them these engineering books and that the original notes were all thrown away. So it's not all hearsay. Would you would you concede that? At least as to the portions that Mr. Dillon didn't disavow, there wouldn't be a hearsay problem, would there? Well, there's no hearsay problem with what Mr. Acri says, because he's a party. What he says is an exception. But even with Mr. Dillon? Well, Mr. Dillon is not a party. Because he took the stand and he disavowed certain statements and didn't disavow others. So if the witness says, well, I said that, there's no hearsay problem there. Well, there is. There is. But let me drill down. Why is an overcoma impeach? I mean, let's say that the district court has said, I'm going to have a hearing on the sanction motion and bring your witnesses. Well, first witnesses come up as Dillon. He disavows and they impeach him with the statement. I mean, that's that's perfectly acceptable. Yeah. But then you go on and I can produce a witness and documents and all sorts of things that say, you know what? Let me show you about the two books. Well, right. Right. But let me stop you there. Here's here's. So why? If they can produce a witness or they produce Dillon and impeach him with the transcript, why isn't it harmless error what occurred here at best? Because leaving aside the other testimony, I take your point on that. But, you know, the it was going to come in on impeachment anyway. I mean, I may agree with you that it's hearsay and shouldn't have been admitted in the first instance. But all I have to do is put him on the stand and impeach him. OK, I'm running out of time. And I want to drill down on the two issues. And there are only two issues that I want to address. Well, why don't you address your questions? OK, there were only two. The judge, the district court judge drilled in on two issues. He said there's only two things right to corroborate this. OK, the notebooks, the engineering notebooks. Right. And then I'll think of the other one in a second. Let's talk about the engineering notebooks. Mr. Acri said he gave his in the middle of the project, he came in and gave his people formal engineering notebooks and says, clean up your desks. OK, Mr. Acri said he never told anyone to throw anything away. He said, organize your desks, organize the project, put it here. Now, Dillon said, Acri said, throw the other stuff away. But then Dillon recanted that. Look, that's a critical issue. Something when you go to a jury, the T-Mobile folks will put on evidence, say that engineering books are unreliable to the extent they even matter in this case. But they put on the evidence saying they're unreliable. Mr. Acri would come in and say, no, they're pretty reliable. And then you'd end up going with the individual witnesses saying, witness one, what did you throw away? What did you keep? You know, that's how that plays out. The discovery process in civil cases, the trial courts, district courts are necessarily dependent on the honesty and integrity of the parties to the proceeding. And because of that, we give them wide latitude in making decisions about these subjects. And I'm sorry, I just don't see where this district court did anything wrong. If everything Mr. Dillon said was a lie, like he swore under oath, the district court made a horrible error and it threw a righteous victim of a contract breach right out the door. If Mr. Dillon was telling the truth about a lot of things and then lied under oath, well, then that's where we are right now. This is an ultimate fact question. Now, it comes up in the context of discovery, but it's no less meaningful than an ultimate fact question that would come up on summary judgment. This is the kind of factual dispute that there should have been if you're going to do it. You've got to have an opportunity for us to put in lots of evidence. But what's the chance for that? That's what I'm curious about. I mean, that's, I take your argument that it should have, perhaps should have been a full-blown hearing, but I don't see where in the record where you asked the district court for it. We, well, I'll tell you, it was a judgment of tactics. I shouldn't have asked why. Well, no, I'm going to tell you. What is the consequence of your failure to ask? Let me ask that, because why is the litigation, you know, that's your strategy. Yeah, look, you know, you make judgments in the cases. In this case, the first order that came out of the district court on this issue was, NetLogix, get this guy Dillon, you are ordered to get this guy Dillon up to Seattle. He's not even our guy. He ordered us to have that happen. Yeah. Okay. It is very clear what the mood of the district court is. I see I'm over time, and I apologize. That's all right. The mood of the district court was very clear on this. No messing around, no games. Get Dillon here. I'm not going to walk in and say, district court judge, I don't have to. He's a third-party witness, which was my right, but I'm not going to play. And then when he ordered that very narrow hearing just on those simple issues, look, we're doing exactly what the district court said, because the district court made it very serious. And then we made our arguments, our hearsay arguments, our illegal recording arguments, and we made the argument, look, judge, if you're going to do this, and we argued this in the briefing, let's do this, you know, in a factual hearing. I threw the Seventh Amendment up. I said, you're truncating the jury trial, right? All sorts of things. Anyway, I'm way beyond time. We'll give you some time for rebuttal, though. Okay. Thank you. Thank you. May it please the Court, I'm Steve Rumage, and I'm appearing this morning on behalf of the defendant and the appellee, T. Mobile. And Your Honors have already zeroed in on where I want to start, which is that, you know, this is a case where the district judge made direct findings on the matters at issue. He found that there was collective honesty dishonesty, I should say, that has, and I quote, undermined the truth-finding function of the court beyond repair. Now, my trouble, and maybe you can help me with this, is that you made a motion to dismiss, and there was really never a hearing on that motion. What it was was a hearing on the truth of a transcript. So where did your opponent have the chance to contest it? I mean, I look at this, and I understand it may have been a tactical choice, but there was never really hearing on your motion. Well, I would say that there was a hearing, perhaps not a full-blown evidentiary hearing, as Your Honor, I think, is implying. I would say a couple of things about that. First of all, I don't think that's required. For example, if you look at the Leon case, Judge Peckman in the Leon case did not even have an evidentiary hearing. She didn't call a single witness. She simply looked at the transcript of Dr. Leon and made determinations based upon that, and this Court affirmed. Didn't NetLogic move to reconsider and ask for a full hearing? To my knowledge, there was no motion for reconsideration filed, but Or a request for a full hearing? Mr. Moran was saying something in his comments a moment ago about that, but I read the entire record over the last few days, and I do not recall seeing that. He did make Seventh Amendment arguments in the same respect that he just made to Your Honors, but I do not recall seeing that. And I would say that, and this is actually going to be what my very first point was, the reason that that was unnecessary, or one of the reasons that was unnecessary, is that the evidence that came in through declarations in combination with the testimony of Mr. Dillon established beyond any doubt that there had been spoliation, period, admitted spoliation by NetLogic. And I'll tell you exactly what I'm getting at. First of all, we talk about the engineering notebooks. Mr. Moran alluded to those. And it's important to put in context what we're talking about as a predicate to what I'm about to say. This case, Mr. Moran says it's a garden variety breach of contract case, and at some level that's true, but it's a contract that involved repeated performance over 18 months. So there would be 300 projects that were the subject of separate purchase orders, separate documentation, separate invoicing. So we wanted to show a course of dealing. Our whole defense was there was a course of dealing that shows that we did exactly what the parties contracted for us to do, 300 times. Invoices, purchase orders, all lined up just the way we say they should line up. And so what happened when the case began was what we wanted was the project files and the project notes, right? And they're produced in about 17 boxes. And it turns out, admitted eventually by NetLogic that what we got wasn't the contemporaneous documentation. Because the project notes that Mr. Moran talked about, that is the notebooks, those had all been thrown out because the new notebooks had had things copied in. And it was uncontroverted that it wasn't just stuff from other documents that were copied into the engineering notebooks. It was uncontroverted in the evidence offered by NetLogic that it was supplemented by, quote, recollections, close quote, of things that had occurred. So there were no longer any contemporaneous notes we could use to show the course of dealing. What about the project files? Turned out the project files, after the contract had been terminated, when the parties were careening toward litigation, they had created out of whole cloth, and this is admitted by Mr. Acree, who he says never testified. Mr. Acree says, as part of the audit, which was essentially them going back and creating new documents for these files, we created the new invoices and documents to reflect the contract pricing. That is their theory of the contract pricing. So they essentially gave us, to start with, documents that didn't exist. And then we had a forensic computer specialist go into the database, somebody who specialized in exactly the kind of database they used, the project management database. There was in the record at, trying to find, oh, first they told us, in Exhibit Record 1480, they told us nothing had been modified in that database except for subsequent payments by T-Mobile. All right? We then had a forensic expert go in and look. She found that 11,000 fields had been changed or added after the contract was terminated. She found that there had been over 100 projects added to the 300 that had actually been done. She found that there had been new, and that, pardon me, that every single project had been modified. So then, after telling us that none of this modification had been happened, and after being confronted with the forensic expert's testimony, Mr. Acree comes in with a declaration, and he says this. He says, oh, yes, after contract termination, this is at Excerpt of Record 948, after contract termination, quote, we went through the file and cleaned it up to make it more accurate, close quote. Now, when parties go through files after litigations on the horizon and clean them up to make them more accurate, we call that spoliation. And that is exactly what Judge Martinez found. And he was troubled, especially in the context that all of this had been a joint effort by Mr. Dillon together, he was troubled by the fact that it was uncontroverted. Again, look at Mr. Dillon's declaration, paragraph 14 at Excerpt of Record 908. Ten percent of the profit out of this litigation was to go to Mr. Dillon, who then carried out what I just described. So here we have all of that uncontroverted, completely independent of the transcript. And in that context, Your Honor, to get back to your question that precipitated all of this, I don't think Judge Martinez needed to call people in and prolong the agony any longer. Well, you know, for example, in Leon and other cases, you have a transcript with which you're dealing, which was taken under oath, something to evaluate. Here you have an unverified secret transcript taken and nothing that's of record. So it's hard, it's, I understand Judge Martinez's desire to authenticate it, but to me it's an odd procedure. I mean, she just had a hearing on the motion, say, all right, put on your evidence. Except that I would say, Your Honor, what I just described to you didn't come from Mr. Dillon. No, I understand. I understand that part of your argument. If Mr. Avery. Yeah. Yeah. And so I would say when you're But that wasn't really the, I mean, if reading between the lines, I'm not sure that Judge Martinez primarily relied on that. On the extrinsic evidence? He certainly mentioned it and he, and it was part of his findings. I guess the question is whether that can stand independently of the transcript issue. Well, and I would say in a, first of all, I don't think Your Honor needs to reach that question because in a moment I'm going to explain why I think the transcript issue isn't really an issue and shouldn't trouble this Court in one bit, in part because of the privacy issue that Judge Hawkins raised at the outset of Mr. Moran's argument. But I do think that it's fair to say that after the second hearing with Mr. Dillon, it is fair to say that Judge Martinez was angry. And I think reading the transcript is evident why. I mean, this fellow came up and he played word games with a federal judge instead of candidly talking about what he'd done. And it's interesting, Mr. Moran came up here and he said, you know, it's common for an ex-employee to talk trash about their employer, talk smack, I think is the way he put it, about their employer and then, you know, when put under oath to finally tell the truth. But, you know, that's not what happened. I mean, when you look at this, when Mr. Kipling on behalf of T-Mobile repeatedly pressed Mr. Dillon whether something was true or not true, Mr. Dillon didn't answer. All right? He evaded those questions under oath. And Judge Martinez tried to get him to actually talk and he wouldn't. And that is why, ultimately, there was a finding, and we get back to the fact that the district judge made findings here, there was a finding that he was evasive and noncompliant in the course of that hearing. So I think when you take all of that together, Your Honor, I don't think there should be anything troublesome about the fact that there was no hearing, just like there was no hearing in Leon. I view that as a different circumstance, but go ahead. A different circumstance in what sense? Because I want to make sure I answer Your Honor's concern if there was a different concern than I've actually been addressing. No, go ahead. Okay. So let me then talk about the transcript issue briefly because, you know, what I've been talking about now is what happens if the transcripts aren't admitted. And I think – thank you, Your Honor – I think actually Mr. Moran, near the end of his argument, virtually conceded that if the transcripts are admissible and the district judge's credibility determination is honored, which I think everybody agrees it has to be, then I think we're done. Tell me if I have this time sequence correct. Dylan has the conversation with the lawyers. Yes. Point one in time. Sometime thereafter, he agrees with Mr. Arendt, is it? Acri. Acri, sorry. Mr. Acri, that if NetLogic collects, he'll get 10 percent? No, actually, that agreement was in existence previous to that. That agreement predates  Was it in existence before? Yes. It predates the conversation with T-Mobile. Okay. And he calls T-Mobile and he says, I want to clear my conscience. You've cleared me up. Thank you. Okay. And then the conversation ensues. So when I talk about this conversation, unless your honors want to go in a different direction, I want to talk first about the hearsay issues and then I want to talk about the Washington Privacy Act issue under 9.73.030. So, first of all, with respect to the hearsay issues, candidly, I think this was waived. I do understand that Mr. Moran repeatedly in his brief said, I think this is hearsay. But then when push came to shove and we're in the hearing and Mr. Kipling on behalf of T-Mobile says I move admission of Exhibits 4 and 5, no objection. District Judge Martinez says, admit it. So at that point, I think the question as to the admissibility, certainly under the hearsay and I think arguably under the Privacy Act as well, is waived. I think Evidence Rule 103 is clear. He has to keep renewing that objection until there's a definitive ruling on it. And that did not occur. But in any event, I don't think there's a real hearsay issue at the end of the day. And I know your honors were talking about a statement out of court with a declarant present in court. So tell me why it's not hearsay. Well, when I say there's no hearsay issues, I mean that there's no hearsay exceptions that apply. And we'll leave impeachment aside for a moment, which Your Honor talked about and which we did brief in our brief. But I think this case, I heard in the previous argument Your Honors were asking the question, what's your best case on that? Okay. I'll give you the best case on this. The best case on this is United States v. Valdez Soto, which is a case that we cite in our brief. And it's at 31F 3rd 1467. Criminal case? It is a criminal case, Your Honor. But it is a very similar situation in the sense that you have a participant in a drug transaction who gives a statement to detectives, comes and testifies at trial. His statement on the stand is very inconsistent. It is at that point, he's confronted with the statement that he gave to the detectives. The court admits it under the residual hearsay exception, which used to be subsection, I think it's 803-24, and now it's rule 807. Frank Pantangeli in Godfather II, right? I do remember Frank, but I think it's a slightly different situation. That was a congressional hearing, as I recall. Still under oath. Still under oath, exactly right. The thing that this court said in the Valdez Soto case... May I stop you for a second? Sure. The difference in Valdez Soto, this case, is that the district court in Valdez Soto, they have a hearing on the detective's statement and bring in the defendant and say, all right, here's the statement. Do you disagree with it? It was brought in for impeachment after he testified, and that was different from what happened here. Well, but remember what happened here. When you look at the context of what Judge Martinez said... I've just never seen a case where a district court judge says, I'm going to take a hearsay statement and bring in, order you to produce a defendant so I can determine whether it's true or not, as opposed to saying, testify and then let it in for impeachment. I get your point, Your Honor. I totally do. But I would say that this case is exceptional. I would say that Judge Martinez was confronting an unusual situation. Because remember the way it unfolded is, there were the two conversations. The transcript of the conversations is offered, or transcripts are offered, in connection with the motion to dismiss for spoliation. And then Mr. Dillon's first response to them, under oath, is to say, I didn't say that. Okay, I didn't say that. So in other words, he doesn't say, I said it, but it was untrue. He says, I didn't say that. So Judge Martinez says, you know, I kind of got to get to the bottom of this. You know, if I'm going to decide this motion, I need to know whether that's true or not. And so what his order says initially is, he wants an evidentiary hearing regarding the accuracy of the transcripts. Right, exactly. I mean, the accuracy of the hearsay. I mean, that's not... But remember, that's just one step. Then the next step is, Mr. Dillon shows up and he says, at the first hearing, it is accurate. But, you know, I kind of disavow some of it. Well, do you dis... How much of it do you disavow? Well, I'm not sure I've got it right yet. Well, take your time and get it right, because I need to get it right. And then Judge Martinez gives a little speech at the end of the first hearing, and it's pretty clear at the end of that speech, he's not calling people back to the second hearing just to find out if the statements are true. He says, this case raises some really troubling issues, and I need to get to the bottom of it. And so he calls him back, and at that point, it's pretty clear that Mr. Dillon is not coming back just to testify whether the transcripts are accurate or not, because at the first hearing, we determined that they were. At that point, he was coming back substantively to testify. Let's assume that... Well, I haven't even gotten to my exceptions yet. Let's assume that we agree with all of that, and the findings that support it. Why not a lesser sanction? I think the answer to that, Your Honor, is... I think there are several answers to that. First of all, I think Leon answers that question, because Leon makes clear that where the documents are already gone, and the absence of the documents potentially would affect the outcome of the case, you really don't have much choice. And indeed, in that case, in Leon, there was even a quarrel about whether... On that, why not... Why couldn't the district court say those documents are out? Because if he said those documents... It's their case. They have the burden. Because, remember... The judge says there are problems with this evidence. I think you messed around with this evidence in a way you shouldn't have. It's out. Because we needed affirmative evidence. We needed the affirmative evidence that they destroyed. We needed the evidence that showed the course of dealing. And that evidence was no longer available to us, and never would be, and never could be. Why not put it before a jury with the proper instruction that tells the jury, you may... Let me finish. You may conclude, because these parties destroyed some evidence, that that evidence would have negated their claim. I think it's for exactly the reason that Judge Peckman explained and Leon and this court accepted, which is that, basically, that still leaves you in the predicament that when the other side rebuts something or comes up with an explanation for something, now you don't have the tools to respond. The tools that would have been or could have been. Because, remember, the spoliator doesn't get the benefit of the tools that could have been available to you in the documents that they have now made unavailable through the course of the spoliation. I think that's exactly what Leon says, and I think that's spot on with the circumstances that we have here. Let me ask you one question on the privacy aspect. As to the second conversation, is it correct that Dylan was not advised that there was somebody else on the phone? That's not correct, actually. The only evidence that's in the record is the declaration of Cassandra Kennan. I don't have the record site, but I could get it for you, Your Honor. It's in the excerpts of record, and she testifies that before the court reporter began testing, began keying in his notes, that Mr. Dylan was advised that somebody else was in the room taking notes as before, and that's the only evidence in the record on that. Okay, I'm out of time. Thank you. Thank you very much. We'll give you two minutes for rebuttal. With respect to Ms. Kennan, though, Ms. Kennan submitted contradictory declarations. At the beginning, she said there was no audio recording. She came back, and then it turns out there was an audio recording. We kept trying to get the audio recording. The court shut down discovery. We were never even able to get that, the thing that was said that didn't exist. Let me just go to these issues. I'll take them in reverse order. The question came about a lesser sanction. What about the evidence? And you saw it, which you saw as T-Mobile switched to say, oh, we needed this evidence to show course of dealing, right? Course of dealing was done with the emails. Course of dealing wasn't in the engineering notebooks, had nothing to do with the invoicing, whether it was the OCP or the modified report, right? Course of dealing was in the emails. So if the complaint, they say they can't do their case because the course of dealing, which is the communication, and it had to be communication with their vice president, who's the only one who had capacity, all that stuff is in writing. That has nothing to do with engineering notebooks by some guy who was out in Central Valley in California, okay? Let me go to the issues with Mr. Acri, because when you look at Mr. Acri's declaration and the items that were in Mr. Acri very specifically addressing these things, what you're looking at in characterizing these things is simply spin. And I give you an example. We'll just go right through them because they were brought up real quickly. First of all, the forensic computer experts. Those forensic computer expert reports showed up for the very first time attached to the motion for spoliation, which was also attached to the motion to stay discovery. We never got a chance to test any of those experts or anything they said, right? No chance. The judge didn't pay much attention to those things, at least in the order, and I think we brought that point up. I think that's probably why. The two sets of books. Look, two sets of books, Mr. Acri explained very clearly. He kept, during the interregnum of the modification period, one set of accounts based on original contract pricing, which was set out in that exhibit B to the contract, or exhibit, yeah, the original contract pricing. And another on the modification pricing that was going to go retro back once the four contracts got in place. There's nothing wrong with that. You call it keeping two sets of books like it's something dark, okay, but not in this case. It made all the sense in the world. In fact, if you didn't keep two sets of books, you were probably doing something dark. Your time has expired. Okay. Thank you. Thank you. Thank you both for your arguments this morning. The case just heard will be submitted for decision, and we'll take a 10-minute recess.
judges: Hawkins, Thomas, Nguyen